**In re ERICA.**

Court of Common Pleas of Ohio,
Cuyahoga County,
Juvenile Division.

No. 9406851.

Decided July 11, 1994.

*William Heine* and *Christine Guarnieri,* for Eric.

*Debora Akers,* for Eric's mother.

*Cheryl Alikan,* guardian *ad litem,* for Erica.

*Darlene Brushman,* for Cuyahoga County Department of Children and Family Services.

KENNETH A. ROCCO, Judge.

## I. *INTRODUCTION*

The child in this matter, Erica, who is two years old, was determined by this court to be a dependent child on June 6, 1994, and temporary custody was granted to the Cuyahoga County Department of Children and Family Services (hereinafter referred to as "CFS"). Erica's mother was murdered on April 12, 1994. Erica's father, Eric, was arrested on April 25, and has since been charged with the aggravated murder of Erica's mother. Facing the death penalty, Eric is currently being held in the county jail without bond. Eric requests that this court grant his motion for visitation with Erica, and order that she visit him in jail while he awaits trial. This court's decision regarding this matter should be considered an interim one, pending the outcome of Eric's trial. Should he be acquitted, this court anticipates that CFS would terminate Erica's custody to him. Alternatively, this court expects that CFS would seek permanent custody of Erica if he is found guilty of aggravated murder or murder. See *In re Henderson* (1986), 30 Ohio App.3d 187, 30 OBR 329, 507 N.E.2d 418 (holding that a father's lengthy term of imprisonment following the murder of the child's mother was sufficient to justify the termination of his parental rights). Indeed, this court is mindful of a recent Pennsylvania Superior Court decision, holding that the father's conviction for first-degree murder of the child's mother was alone evidence of severe mental or moral deficiencies, sufficient to justify denial of visitation. *Green v. Sneeringer* (1993), 431 Pa.Super. 66, 635 A.2d 1074. In *Green,* the court stated, "Barring criminal acts committed upon the child, we can think of no action in which a parent could engage posing a graver threat to a child's welfare than killing the other parent. In one grim swoop, the father has deprived his child of both parents' guidance and support." *Id.,* 431 Pa.Super. at 71, 635 A.2d at 1077.

Erica has not seen her father since his arrest. She has been living with her maternal grandparents, where she will remain. Visitation would necessarily take place in the jail visiting room. Eric argues that he has not yet been convicted of his wife's murder, and, as an innocent man, he should not be denied visitation with his daughter. Finally, he argues that it would be in Erica's best interest to visit him. There is no denying, however, that Eric's current incarceration is

based on a legal determination that there is probable cause to believe he is responsible for the aggravated murder of Erica's mother.

## II.  *DISCUSSION*

Initially, Eric bases his argument on well-established Ohio law that a parent's right of visitation with his child is a natural right, and although not absolute, should be denied only under extraordinary circumstances.  *Pettry v. Pettry* (1984), 20 Ohio App.3d 350, 352, 20 OBR 454, 456, 486 N.E.2d 213, 215.  Eric argues that his incarceration, while he awaits trial for the murder of his wife and Erica's mother, should not be considered sufficiently extraordinary to require the suspension of his right to visitation with his daughter, and that visitation with him in jail is in Erica's best interest.

A.  Visitation With An Incarcerated Parent Is Presumptively Not In The Child's Best Interest, And The Incarcerated Parent Bears The Burden Of Proving That The Visitation Is In The Child's Best Interest.

Beyond the general statement concerning the nature of the parent-child relationship, Eric claims that his position is further supported by the decision in *In re Hall* (1989), 65 Ohio App.3d 88, 582 N.E.2d 1055.  *In re Hall* is the only Ohio case which addresses the issue of a child's visitation with a parent who is incarcerated.  However, the holding in *In re Hall* does not support Eric's position.  In his brief in support of his motion for visitation, Eric states that *In re Hall* concluded that the burden of proof to show that visitation with the incarcerated parent is not in the child's best interest rests on the party opposing the visitation.  This is not the holding of *In re Hall*.  In fact, *In re Hall* explicitly states that a young child's visitation with an incarcerated parent "gives rise to an inference of harm to such child so that such visitation is not in the child's best interest," and that "such inference should not be drawn only if the incarcerated noncustodial parent offers evidence demonstrating that, under the circumstances involved, visitation with the noncustodial parent at the place of imprisonment will not be harmful to the child but, instead, will be in the child's best interest."  65 Ohio App.3d at 91, 582 N.E.2d at 1057.  Eric bears the burden of proof to show that it is in Erica's best interest to visit him in jail.

As Eric points out, the father in *In re Hall* had already been convicted and was imprisoned for a term of years.  However, the rationale of the case does not require that its holding be limited to those instances where the parent has already been convicted, as the key to the holding is the place of visitation.  Moreover, the *In re Hall* opinion does not indicate whether circumstances as extreme as those present in this case, where the father is accused of murdering the child's mother, were present, and does not reveal the age of the child

involved. As will be explained further below, Erica's extremely young age, and the circumstances which would necessarily encumber a visit at the jail, make it clear to this court that visitation with her father, while he is incarcerated, is not in her best interest.

Eric has presented no evidence to refute this presumption. While there is some evidence that he has been actively involved in caring for Erica in the past, this is not sufficient to overcome the presumption that visiting him in jail would not be in Erica's best interest.

### B. The Trial Court Has Broad Discretion In Determining The Best Interests Of The Child.

Eric also cites *Johntonny v. Malliski* (1990), 67 Ohio App.3d 709, 588 N.E.2d 200, in support of his request for visitation. The *Malliski* court held that the standard of proof for contesting visitation is clear and convincing evidence. This reliance is misplaced, as both *Malliski,* and *Pettry v. Pettry,* the case on which its holding is based, raise domestic relations issues. Although it is true that the holding of both these cases is that the party contesting visitation privileges bears the burden of proof, domestic relations courts play an entirely different role in resolving the issues of visitation arising in the context of divorce than does this court in this matter. Where neither parent has previously been found to be unfit, and CFS is uninvolved, the party contesting visitation may accurately be said to bear the burden of proof. However, because the juvenile court operates under the doctrine of *parens patriae,* it has been vested with broad discretion by the state in determining the best interests of the child. The holdings of *Malliski* and *Pettry* are simply irrelevant to this decision.

### C. Visitation With Her Father While He Is Incarcerated Is Not In Erica's Best Interest.

Although there is only one Ohio case which addresses the issue in this case, *In re Hall,* there are several cases from other jurisdictions which provide some guidance. In *M.L.B. v. W.R.B.* (Mo.App.1970), 457 S.W.2d 465, the Springfield Court of Appeals held that a parent should not be absolutely foreclosed from any visitation with his children solely because the visitation would have to take place in a penal institution. However, the children in *M.L.B.* were five and ten, and had not been through the extreme trauma which Erica has faced due to the loss of her mother.

Similarly, the children in *McCurdy v. McCurdy* (1977), 173 Ind.App. 437, 363 N.E.2d 1298, were four and seven years old. In *McCurdy,* there was evidence that the prison officials at the penal institution where the father was incarcerated not only permitted, but encouraged, children to visit their fathers in prison.

The children in both these cases were old enough to have some understanding of where their father was to interact with him in a meaningful way and to abide by the restrictions imposed in the prison visiting room with a minimal amount of restraint by an adult. Finally, both of these cases were decided at least fifteen years ago, and little consideration was given to any psychological trauma the children might endure by visiting the parent in the confined and oppressive setting of a jail or prison.

Dr. Steven Neuhaus, Director of the Juvenile Court Diagnostic Clinic, has stated he could "envision some positive outcomes" associated with an interaction between Erica and her father. While this court certainly acknowledges the psychological trauma to which Erica has been subjected because of the sudden absence of both her parents, it is doubtful that the type of visitation which could take place in the county jail would have any benefit for Erica.

Dr. Neuhaus testified that Erica's attention span, as a two year old, is approximately five to fifteen minutes long, depending on the activity in which she is engaged. The very limited attention span of a child of Erica's age would make it impossible for her to comply with the strict regulations of the jail visiting area. Because the rules of the visiting room prevent any physical contact between visitors and prisoners, Erica and her father would be confined to their seats across a table from each other. Therefore, it is quite probable that Erica would have to be physically restrained during her visit with her father. The prospect of such harsh and unpleasant conditions clearly outweighs whatever cold comfort the very limited interaction with her father may provide.

Erica is not able to understand the circumstances of her visit with her father. She will not understand why her father cannot comfort or hold her, and when the visit is over she will have no comprehension of why she cannot remain with her father, or when, if ever, she will see him again. Children of Erica's age base their conception of time on their subjective feelings of loss, rather than on its actual duration as understood by an adult, so an explanation that she will see her father next week will be of little comfort to her. See Goldstein, Beyond the Best Interests of the Child (1979) 41. The end of each visit will cause Erica to experience another painful loss. Erica has already been subjected to the sudden and tragic loss of her mother through a violent death. As a two year old, Erica has only a very limited understanding of the concept of death. See Palombo, Parent Loss and Childhood Bereavement, 9 Clin.Soc.Work J. 3, 14–15. The most significant separation she has endured is the death of her mother. Because she has no other way to understand the separation from her father, it is likely that Erica will experience each separation from him in the same way she has experienced the loss of her mother.

The strict rules of the jail visiting area may also negate, in less tragic, but far from trivial ways, any conceivable benefits of the proposed visitation. Erica would not be permitted to bring any toys or games with her which could facilitate communication with her father, or more importantly, provide for her own comfort and security during the visit. Any parent knows the attachment a two year old can have for her blanket or teddy bear, and the uproar that results if the child is separated from the object of her affection. This judge has himself returned home after completing nearly one hour of a three-hour journey to restore a forgotten "blankie" to an inconsolable toddler. Given the tremendous losses which Erica has already suffered, she should not be subjected to any further avoidable deprivations.

It would be cruel to subject Erica to the trauma and disruption of briefly seeing her father under the confined circumstances that the proposed visitation entails, only to be taken away from him again. This court will not order that Erica be subjected to this trauma repeatedly, so that Eric may be comforted by her visits as he awaits trial.

By definition, the jail visiting area is not a toddler-friendly environment. It has been designed to meet the security needs inherent in the confinement of people determined to be too dangerous to be at large in society. The environment in which the visitation must take place carries great weight because Erica is so young. If she were fourteen, rather than two, and able to voluntarily conform to the restrictions such security measures require, this court would not be as concerned with the impact visitation in the county jail might have on her. However, it appears to this court that the restrictions which would be imposed on Erica during such a visitation, combined with the trauma of seeing her father, but being unable to interact with him in a meaningful way, and then being separated from him once again, is not in her best interest. Finally, it is difficult for this court to ignore the knowledge that Eric is to be tried for a violent and deadly attack against another family member, who was the most important person in Erica's life.

## III.  *CONCLUSION*

The fact that Eric might not be guilty of his wife's murder does not itself carry weight sufficient to override the presumption that visitation, during the period while her father is incarcerated awaiting trial, is not in Erica's best interest. The issue of whether Erica should visit Eric if he is eventually convicted of her mother's murder will be examined when his trial is concluded.

This decision is based upon the very limited nature of the visitation that could take place between the parent and child in a highly restrictive setting, Erica's young age, and the extreme trauma to which she has already been subjected.

Were Eric able to secure a location other than the jail visiting room for the visitation, in an toddler-friendly environment which would require less restrictions on Erica's activities, this court might reconsider this decision. To that end, Eric is free to make such a request to the general division jurist assigned to his aggravated murder case.

## IV. *ORDER*

The motion for visitation is denied.

*Motion denied.*